# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# FORT MYERS DIVISION

## IN ADMIRALTY

IN THE MATTER OF the
complaint of JAMES SCHNEIDER,
as owner of a 2005 34' S2 Yachts
motor vessel, HIN SSUH4102G405,            Case No. 2:21-CV-00549-JES-KCD
USCG Official No. 1267657, for
exoneration from or limitation of
liability,

      Petitioner,

v.

JULIE LEONARD,

      Claimant/Third-Party Plaintiff,

v.

ROBERT SLADE

      Third-Party Defendant,

v.

ALLSTATE PROPERTY AND CASUALTY
INSURANCE COMPANY,

      Claimant/Counterclaim Plaintiff.
_____/

## FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

This matter involves the collision of two recreational vessels in dense fog while underway in the Gulf of Mexico off the coast of Naples, Florida.  The relevant pleadings are as follows:

- James Schneider ("Schneider"), the owner of one of the vessels involved in the collision, filed a Complaint for Exoneration From or Limitation of Liability (Doc. #1) in connection with the collision. The Complaint asserted that the accident was caused solely by the negligence of Julie Leonard.  (Doc. #1, ¶¶ 15-16.)

- Dr. Julie Leonard (Dr. Leonard), the owner and operator of the other vessel involved in the collision, filed an Answer and Affirmative Defenses and Claim.  (Doc. #12.)  Dr. Leonard subsequently filed a Second Amended Complaint based on diversity of citizenship and admiralty jurisdiction.  (Doc. #61.)  The Second Amended Complaint asserted negligence claims against Schneider and Robert Slade ("Slade"), the operator of Schneider's vessel at the time of the collision. (Id., pp. 3-4.)

- Allstate Property and Casualty Insurance Company ("Allstate") filed an Answer, Affirmative Defenses and Claim as the subrogee of Dr. Leonard.  (Doc. #21.)   In the same capacity, Allstate also filed a

Counterclaim against Schneider for negligence, seeking recovery for property damage to Dr. Leonard's vessel.   (Id.)

The Answers (Docs. ##12, 21, 30, 65, 66) have admitted certain basic facts, and the parties have stipulated to various facts (Doc. #103, pp. 8-10) and the admission of 86 joint trial exhibits.   All parties submitted trial briefs and/or proposed findings of fact and conclusions of law.  (Docs. ##102, 104, 109, 112, 124.)   As the parties saw it prior to trial, "the only issue for the court to determine is liability, if any, of the three parties to the collision, Leonard, Schneider and Slade." (Doc. #103, p. 3.)

The Court conducted a non-jury trial on February 8, 2023.  The Court heard testimony from Schneider, Slade, and Dr. Leonard, as well as expert witnesses Mitchell Stoller and Robert K. Taylor.  Schneider and Slade both made motions for judgment as a matter of law, and the Court declined to render a judgment and took the motions under advisement.  See Fed. R. Civ. P. 52(c).  With the permission of the Court, the parties have filed supplemental proposed findings of fact and conclusions of law.  (Docs. ##126-129.)

## FINDINGS OF FACT

From the testimony and documents received as evidence at trial, the Court finds the following facts have been established by at least a preponderance of the evidence (unless otherwise indicated):

3

### A. The Vessels and Their Owners

Schneider is the owner of a 2005 34-foot S2YACHTS Motor Vessel, HIN# SSUH4102G405, USCG Official No. 1267657, manufactured by Pursuit Boats, referred to in court proceedings by the pseudonym "Whiskey Tango Foxtrot" (the Schneider Vessel). The Schneider Vessel is a fishing boat which has a center console and twin three hundred horsepower engines, and is equipped with a marine radio, flare, horn, and lights.

Dr. Leonard is the co-owner of a 2019 24-foot Boston Whaler, bearing HIN# BWCE1678A919 and Florida Registration No. FL6069SM, named "Paradox" (the Leonard Vessel). The Leonard Vessel gets "on plane" at about twelve miles per hour, and its top speed is in the 40s miles per hour. The Leonard Vessel is equipped with standard navigation running lights, a horn, and a single outboard engine. The Leonard Vessel is also equipped with a GPS device which recorded the vessel's location, heading, and speed at all relevant times. The Court finds this GPS data, and the explanation and interpretation of this data by Robert K. Taylor, to be reliable and credible.

The respective dimensions of the two vessels, as set forth in Joint Exhibits 27 and 29, are as follows:

|        | Schneider Vessel | Leonard Vessel |
|--------|------------------|----------------|
| Length | 34'5"            | 23'2"          |

| Beam | 9'6" | 8'6" |
| --- | --- | --- |
| Weight | 9,200 lbs. | 3,900 lbs. |

Both the Schneider Vessel and the Leonard Vessel are "vessels" within the meaning of 1 U.S.C. § 3 ("The word 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water") and the Limitation Act. Keys Jet Ski, Inc. v. Kays, 893 F.2d 1225, 1230 (11th Cir. 1990). Both are also "vessels" and "power-driven vessels" within the meaning of Rule 3(a) and (b) respectively of the International Regulations for Preventing Collisions at Sea (commonly referred to as COLREGS or the navigational "Rules of the Road")[1].

At all relevant times Allstate insured the Leonard Vessel against certain property damage. See Joint Exhibit 84.

## B. The Parties and Their Seamanship Experience

Schneider resides in Michigan and vacations periodically at a location on Marco Island, Florida. For the last ten years or so, Schneider has owned and operated the Schneider Vessel in the Marco Island area. Schneider has taken a boating course

---

[1] COLREGS are the navigational duties of a vessel, originally contained in The International Regulations for Preventing Collisions at Sea, Oct. 20, 1972, 28 U.S.T. 3459, and now codified by Congress at 33 U.S.C. § 1601 et seq.

in Michigan, but not in Florida.  Schneider has also operated vessels in Michigan, including on the Great Lakes.  Schneider was not familiar with the navigational "Rules of the Road," at least by number.

Dr. Leonard is a resident of Ohio who, along with her husband, owns a residence in Southwest Florida.  Dr. Leonard started boating at a young age, and is a life-long boater with extensive experience.  Dr. Leonard and her husband took a boating safety course in Florida, and then purchased the Leonard Vessel in the Fall of 2019.  Dr. Leonard has been the primary operator of the Leonard Vessel after its purchase.  Dr. Leonard was well-aware of the navigational "Rules of the Road."

Slade is a friend of Schneider's from Michigan.  Slade has owned several boats before this incident, including a 22' Pontoon boat with 110 horsepower motor.  Slade had controlled and/or captained a 19' Mastercraft with a 260-horsepower motor in Florida, and had boated with Schneider in the Great Lakes.  Slade had never operated the Schneider Vessel before the collision, but had operated a similar one.  Slade has taken a boating course in Michigan, but not in Florida, and was aware of the navigational "Rules of the Road."

While Schneider knew Slade had a boat in Michigan for 30 or 40 years, he did not know whether Slade had taken a boating course in Michigan and did not know the details of his boating experience.  Schneider did not know whether Slade was familiar with the "Rules of the Road."

### C. Pre-Collision Events of February 8, 2021

Slade had come to Florida to visit Schneider.  On February 8, 2021, Schneider and Slade left Marco Island at mid-morning to go fishing for the day in the Schneider Vessel.  They were the only occupants of the Schneider Vessel.  Slade drank a beer in the vessel before they stopped for lunch at a marina.  During lunch Schneider and Slade each had a beer.  They finished lunch at about 3:00 p.m., approximately two and one-half hours prior to the collision.  There is no reliable evidence that either Slade or Schneider consumed any other alcohol that day or were under the influence of alcohol at the time of the collision.

On February 8, 2021, Dr. Leonard had dropped off the Leonard Vessel at Marine Max in Naples, Florida for routine 100-hour maintenance service.  Dr. Leonard returned to Marine Max at approximately 4:30 p.m. and was dropped off by her husband.  Dr. Leonard intended to pick up the Leonard Vessel and pilot it home.  Dr. Leonard had made the same trip at least a dozen times before without incident.

At approximately 4:50 p.m., Dr. Leonard began to pilot the Leonard Vessel as she departed from Marine Max.  Upon her departure,  the weather was calm, clear, and sunny with light wind and no chop, and Dr. Leonard did not turn on the Leonard Vessel's navigation lights or don a life jacket.  Dr. Leonard was the sole occupant and operator of the Leonard Vessel.  Dr. Leonard headed south out of Marine Max, proceeded west out of Gordon Pass, then turned north (right) into the Gulf of

Mexico at approximately 5:19 p.m.  See Joint Exhibit 25.  The Leonard Vessel was south of the ultimate collision location, heading north-northeast while in the Gulf of Mexico.

Schneider estimated that he drove the Schneider Vessel 99 percent of the time during that day.  At the relevant times, the Schneider Vessel was north of the ultimate collision location heading south in the Gulf of Mexico approximately two miles from shore.  It had been a nice sunny day, and the Schneider Vessel did not have its navigation lights activated.

Weather conditions in the Gulf of Mexico changed for both the Schneider Vessel and the Leonard Vessel.  Both vessels first experienced patchy fog and then dense fog.

While in the Gulf of Mexico, the Leonard Vessel averaged about 30 miles per hour.  At approximately 5:34 p.m., Dr. Leonard brought the Leonard Vessel's speed to near-zero for approximately one minute because of dense fog and resulting condensation on the windshield.  During this time Dr. Leonard put on a life jacket, turned on the navigation lights, put a cutoff-switch lanyard around her wrist, and sounded the horn.  Dr. Leonard then resumed speed, getting up to 36 miles per hour at least twice prior to the collision.  Dr. Leonard testified she sounded the vessel's horn every two to five minutes when she felt there might be a hazard.  There is no reliable evidence that Dr. Leonard sounded the horn within two minutes prior to the

collision, and the parties have stipulated that neither vessel was sounding two prolonged blasts using their horn or whistle at an interval of not more than every two minutes.  (Doc. #103, p. 9, ¶ i.)

From Schneider's perspective, the fog quickly became dense, and he realized it was not just a small patch of fog.  Schneider turned over operation of his vessel to Slade, without any inquiry as to his experience or ability to operate the vessel, while he began the process of turning on the navigation lights.  Slade maintained speed while Schneider walked to the starboard bow area, flipped on the navigation lights, and turned the spreaders up.  Schneider then returned to the center console area where Slade was operating the vessel.  Schneider also functioned as the lookout while Slade was operating the vessel.  The Complaint alleges (Doc. #1, ¶ 6), and Schneider testified, that his vessel was going about five miles an hour or less at this time.  The Court finds, however, that the testimony of his expert Robert K. Taylor is more reliable, and establishes that the Schneider Vessel was travelling at approximately ten miles per hour just prior to and at the time of the collision.

### D.  The Collision and Its Aftermath

At approximately 5:41 p.m., the Schneider Vessel and the Leonard Vessel collided with one another in the Gulf of Mexico, about two miles seaward of Wiggins Pass not far from Naples, Florida, while both vessels were being operated

in dense fog conditions.  The collision took place outside the demarcation lines –
dividing the high seas from the inland waters of the United States.

Approximately three seconds before the collision, Schneider saw the Leonard
Vessel on plane, throttle wide open, coming out of the fog directly at his vessel.
Schneider yelled either "boat, boat, boat" or "boat, boat."  Slade responded "where,"
and started to turn the Schneider Vessel to the left.  According to Mr. Taylor's
testimony, which the Court finds reliable, Slade's action caused the Schneider
Vessel to lean in the water, but not to actually change course because there was not
enough time between initiating the turn and the collision.  Slade never saw the
Leonard Vessel prior to impact.

In the few moments prior to the collision, the Leonard Vessel was heading
north in the Gulf of Mexico approximately two miles from shore.  For the minute or
two prior to the collision, GPS data establishes Dr. Leonard was operating her vessel
on plane at around 30 miles per hour, which would creep up to 36 miles per hour.
See Joint Exhibit 22.  At the time of the collision, Dr. Leonard was standing at the
console so she could see over the windshield, which had become covered with
condensation due to the fog.  Dr. Leonard could see approximately 75 to 100 feet.
At the time of the collision, Dr. Leonard was operating her vessel on plane at 29
miles per hour.

Dr. Leonard first saw the Schneider Vessel and Schneider at the console area from a distance of about 75 to 100 feet.  In the approximate three seconds between her sighting the Schneider Vessel and the collision, Dr. Leonard made a hard turn starboard with one hand on the wheel and hit the throttle to full speed with her other hand.  Dr. Leonard did not have time (or an additional hand) to sound her horn.  Dr. Leonard did not see Slade, who was operating the Schneider Vessel, until after the collision.

Dr. Leonard testified that just prior to the collision she saw the Schneider Vessel veer to port and basically cut across her bow.  She testified that her maneuver got her out of the path of the Schneider Vessel, and if the Schneider Vessel had turned starboard there would not have been a collision.  Dr. Leonard testified the Schneider Vessel's starboard bow hit the port side of the Leonard Vessel in a bow-to-bow collision.  Dr. Leonard further testified that the Leonard Vessel's 29 miles per hour speed, was a "slow" speed, which was safe because it gave her increased visibility and maneuverability.  She further stated that 29 miles per hour was appropriate for what she needed to do at the moment.  For reasons discussed later, the Court does not credit any of this testimony.

The impact of the initial collision knocked Dr. Leonard into the windshield and then onto the deck of the Leonard Vessel.  Dr. Leonard was momentarily knocked unconscious, and came to on the deck at the stern of her vessel.  Because

Dr. Leonard had failed to securely attach the emergency engine cut-off lanyard to her wrist, the engine did not cut off, and the Leonard Vessel was spinning in circles at a high rate of speed. The Leonard Vessel hit the Schneider Vessel at least one more time while circling. Dr. Leonard regained consciousness, crawled to the console, and pulled the throttle, powering her vessel down.

Dr. Leonard suffered a concussion and could not move for a while. Dr. Leonard was unable to operate her vessel, and testified that she was not in a position to make decisions because of her injuries. Dr. Leonard's cell phone was lost overboard, and Dr. Leonard refused to let Schneider or Slade make a 911 or other emergency call on her behalf. Dr. Leonard testified that she self-assessed her condition, did not believe she would benefit from an ambulance, and wanted a choice as to where she would be taken for medical care. Dr. Leonard called her husband, who is a pediatric neurosurgeon. Dr. Leonard and both vessels were ultimately taken to the Coast Guard station at Wiggins Pass by Schneider and Slade.

The collision resulted in minor damage to the Schneider Vessel, but significant damage to the Leonard Vessel. The post incident value of the Schneider Vessel is stipulated to be $91,500.00. (Doc. #103, p. 10.) Allstate declared the Leonard Vessel a total loss and paid the property damage claim on March 30, 2021. The parties have stipulated that Allstate's property claim damage totals $108,000.00 (Doc. #101; Doc. #103, p. 8.) Dr. Leonard sustained injuries in the collision, and

she has stipulated that the value of such injuries, not reduced by any negligence on her part, is $400,000.00. (Doc. #78; Doc. #103, p. 8.)

Additional facts will be discussed below after a discussion of the applicable law.

## CONCLUSIONS OF LAW

The United States Constitution vests jurisdiction over admiralty cases in the federal courts. U.S. Const. art. III, § 2.  This jurisdiction is granted to the federal district courts by 28 U.S.C. § 1333(1), which provides that "district courts shall have original jurisdiction, exclusive of the courts of the States," over "[a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled."  28 U.S.C. § 1333(1).  The terms "admiralty" and "maritime" are "virtually synonymous."  Aqua Log, Inc. v. Lost & Abandoned Pre-Cut Logs & Rafts of Logs, 709 F.3d 1055, 1057 n. 1 (11th Cir. 2013).  Federal admiralty jurisdiction extends to all navigable waters of the United States.  Aqua Log, Inc., 709 F.3d at 1058.  A waterway is navigable if it is capable of being used in commerce.  Id. at 1062.  The waterway involved in this case, the Gulf of Mexico, is obviously navigable.

Federal courts have exclusive admiralty jurisdiction to determine whether the vessel owner is entitled to exoneration or limitation of liability.  46 U.S.C. §§ 30501, et seq.; Beiswenger Enters. Corp. v. Carletta, 86 F.3d 1032, 1036 (11th Cir. 1996);

13

Suzuki of Orange Park, Inc. v. Shubert, 86 F.3d 1060, 1063 (11th Cir. 1996). In addition to filing a damage claim in the limitation proceeding, a person or entity may file a negligence action as part of the limitation proceeding. Murphy v. Fla. Keys Elec. Co-op. Ass'n, Inc., 329 F.3d 1311, 1319 (11th Cir. 2003), citing Cont'l Cas. Co. v. Canadian Universal Ins. Co., 605 F.2d 1340, 1344 (5th Cir.1979). As noted above, both Dr. Leonard and Allstate have filed negligence actions against Schneider and/or Slade as part of this limitations proceeding.

This case is governed by the maritime law of the United States. The relevant navigational duties of a vessel are set forth in the International Regulations for Preventing Collisions at Sea (COLREGS), codified at 33 U.S.C. §§1601-1608. The COLREGS apply to "(1) all vessels, public and private, subject to the jurisdiction of the United States, while upon the high seas or in waters connected therewith navigable by seagoing vessels, and (2) all other vessels when on waters subject to the jurisdiction of the United States." 33 U.S.C. § 1603. The COLREGS "do not apply to vessels while in the waters of the United States shoreward of the navigational demarcation lines dividing the high seas from harbors, rivers, and other inland waters of the United States." 33 U.S.C. § 1604(a). "The waters inside of the [demarcation] lines are Inland [Navigation] Rules waters. The waters outside the lines are COLREGS waters." 33 C.F.R. § 80.01(b). The relevant demarcation lines are found at 33 C.F.R. § 80.748(c) and (f). As the Court has found, "[t]he collision

14

took place outside the demarcation lines dividing the high seas from the inland waters of the United States." *Supra*, p. 10. Additionally, the parties have stipulated that this case is governed by the COLREGS. (Doc. #103, p. 11.) [2]

The COLREGS, also referred to as navigational "Rules of the Road," are set forth in Joint Exhibit 86 and can also be found at the USCG Navigation Center website at https://www.navcen.uscg.gov/navigation-rule-amalgamated. Both locations also include the Inland Navigational Rules.

To the extent it is a legal conclusion, see Keys Jet Ski, Inc., 893 F.2d at 1227, both the Schneider Vessel and the Leonard Vessel are "vessels" within the meaning of 1 U.S.C. § 3, the Limitation Act, and the Rules of the Road. A "collision" occurs when a moving vessel strikes another moving vessel; an allision occurs when a moving vessel strikes a stationary object. Fischer v. S/Y NERAIDA, 508 F.3d 586, 589 (11th Cir. 2007). This case only involves a collision.

---

[2] Despite the stipulation, both Dr. Leonard and Allstate submitted post-trial Proposed Finding of Facts & Conclusion of Law which include a finding that the Inland Navigational Rules apply. (Doc. #126, p. 5; Doc. #127, p. 4.) Except for a situation not relevant here, the Inland Navigation Rules only apply to "vessels upon the inland waters of the United States." 33 C.F.R. § 83.01(a). The collision in this case did not occur on the inland waters of the United States, so the Inland Navigation Rules do not apply in this case.

The Limitation Act, 46 App. U.S.C. § 30505,[3] "allows a vessel owner to limit liability for damage or injury, occasioned without the owner's privity or knowledge, to the value of the vessel or the owner's interest in the vessel," Lewis v. Lewis & Clark Marine, Inc., 531 U.S. 438, 446 (2001), plus any freight. In a typical limitation proceeding, the court determines whether the vessel owner is entitled to limited liability by undertaking a two-step analysis:

> First, the court must determine what acts of negligence or conditions of unseaworthiness caused the accident. Second, the court must determine whether the shipowner had knowledge or privity of those same acts of negligence or conditions of unseaworthiness.

Hercules Carriers, Inc. v. Claimant State of Fla., 768 F.2d 1558, 1563–64 (11th Cir. 1985), quoting Farrell Lines, Inc. v. Jones, 530 F.2d 7, 10 (5th Cir.1976). See also Am. Dredging Co. v. Lambert, 81 F.3d 127, 129 (11th Cir. 1996); Suzuki of Orange Park, Inc., 86 F.3d at 1062. Dr. Leonard and Allstate have the burden of establishing the acts of negligence or conditions of unseaworthiness that caused the accident, then Schneider bears the burden of establishing his lack of privity or knowledge.

---

[3] 46 App. U.S.C. § 30505(a) provides: "The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not ... exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

Suzuki of Orange Park, Inc., 86 F.3d at 1062–63; Hercules Carriers, Inc., 768 F.2d at 1564.   To produce liability, the acts of negligence or the conditions of unseaworthiness must be a contributing and proximate cause of the collision. Hercules Carriers, Inc., 768 F.2d at 1566.

Liability in vessel collision cases has always been apportioned based on fault. Bunge Corp. v. Freeport Marine Repair, Inc., 240 F.3d 919, 923 (11th Cir. 2001). Fault encompasses the violation of a statute or applicable navigation rule or regulation, see Folkstone Maritime, Ltd. v. CSX Corp., 64 F.3d 1037, 1046 (7th Cir.1995), as well as negligence that can arise from the failure to exercise the due care required of a reasonably competent boater.   See Fischer, 508 F.3d at 594-94. "A shipowner is entitled to exoneration from all liability for a maritime collision only when it demonstrates that it is free from any contributory fault." Lambert, 81 F.3d at 129, citing Tittle v. Aldacosta, 544 F.2d 752, 755 (5th Cir. 1977) ("Exoneration is contingent upon a finding of no contributory fault.").

While liability in collision cases is apportioned based on fault, several rebuttable presumptions similar to the doctrine of *res ipsa loquitur*[4] have evolved to shift the burden of production and persuasion.  Fischer, 508 F.3d at 593.  The only

---

[4] "Res ipsa loquitur—Latin for 'the thing speaks for itself'—is an evidentiary doctrine that permits a trier of fact to infer a defendant's negligence from unexplained circumstances." Tesoriero v. Carnival Corp., 965 F.3d 1170, 1180 (11th Cir. 2020).

presumption relevant to this case, the <u>Pennsylvania</u> Rule, provides that when a ship is involved in a collision and that ship is in violation of a rule designed to prevent collisions, the burden shifts to the shipowner to prove that the violation was not a contributing cause of the collision. <u>Lambert</u>, 81 F.3d at 130, citing <u>The Pennsylvania</u>, 86 U.S. 135, 136, 22 L. Ed. 148, 151 (1873).

In order for the <u>Pennsylvania</u> Rule presumption to apply, however, there must be some relationship between the navigational rule violated and the harm that occurred.  <u>Hatt 65, LLC v. Kreitzberg</u>, 658 F.3d 1243, 1252 (11th Cir. 2011).  The question becomes

> whether the fault contributed to the collision, whether in any degree it was the cause of the vessels coming into a dangerous position. It must be conceded that if it clearly appears the fault could have had nothing to do with the disaster, it may be dismissed from consideration. The liability for damages is upon the ship or ships whose fault caused the injury. But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been.

<u>The Pennsylvania</u>, 86 U.S. at 136, 22 L. Ed. at 151.  The burden is on the party invoking the <u>Pennsylvania</u> Rule to demonstrate by a preponderance of the evidence that the other vessel was in violation of a statute or rule intended to prevent the type of accident that occurred.  <u>Hatt 65, LLC</u>, 658 F.3d at 1252.  Thus, "[f]or the <u>Pennsylvania</u> Rule to apply, three elements must exist: (1) proof by a preponderance

18

of evidence of violation of a statute or regulation that imposes a mandatory duty; (2) the statute or regulation must involve marine safety or navigation; and (3) the injury suffered must be of a nature that the statute or regulation was intended to prevent." Hatt 65, LLC, 658 F.3d at 1252, quoting Folkstone Maritime, Ltd., 64 F.3d at 1047. The Pennsylvania Rule "is not a rule of liability, but shifts the burden of proof as to causation." Orange Beach Water, Sewer, & Fire Prot. Auth. v. M/V Alva, 680 F.2d 1374, 1381 (11th Cir. 1982) (citations omitted).

If each vessel invokes the Pennsylvania Rule against its opponent, then each vessel must overcome a presumption of fault by showing its violation could not have been a cause of the collision.  If neither vessel can satisfy its burden under the Pennsylvania Rule, then the district court must "determine the comparative fault of each vessel and allocate liability for damages accordingly." Superior Const. Co., Inc. v. Brock, 445 F.3d 1334, 1340–41 (11th Cir. 2006) (citations omitted.)  "When both vessels involved are operating in violation of rules designed to prevent such mishaps, the Pennsylvania Rule requires 'the district court to find that the statutory fault of both vessels contributed to the accident, unless it [finds] that the fault of either (or of both, for that matter) could not have been a cause of the collision.'"  Parker Towing Co. v. Yazoo River Towing, Inc., 794 F.2d 591, 594 (11th Cir. 1986) (citation omitted.)

In collision cases the standard of care is reasonable care under the circumstances. Superior Const. Co., 445 F.3d at 1339–40; Hercules Carriers, Inc., 768 F.2d at 1564 & n. 3. "The standard for reasonableness is that of prudent men [and women] familiar with the ways and vagaries of the sea." Hatt 65, LLC, 658 F.3d at 1249, quoting Petition of the United States, 425 F.2d 991, 995 (5th Cir.1970). The standard of care is based upon "(1) general concepts of prudent seamanship and reasonable care; (2) statutory and regulatory rules ...; and (3) recognized customs and usages." Fischer, 508 F.3d at 594  (citation omitted.)  What "reasonable care" requires changes with the circumstances.  Id. at 593–94.

If Leonard and Allstate establish a negligent act or condition of unseaworthiness, Schneider will have the burden of showing that the collision occurred without his privity or knowledge.  Privity or knowledge "generally refers to the vessel owner's personal participation in, or actual knowledge of, the specific acts of negligence or conditions of unseaworthiness which caused or contributed to the accident." Suzuki of Orange Park, Inc., 86 F.3d at 1064.  See also Petition of M/V Sunshine, II, 808 F.2d 762, 763 (11th Cir.1987). "Knowledge" also includes information the owner could have and should have obtained by reasonable inquiry or inspection.  Hercules, 768 F.2d at 1577; Lambert, 81 F.3d at 130; Suzuki of Orange Park, Inc., 86 F.3d at 1064. "The shipowner's privity or knowledge is not measured against every fact or act regarding the accident; rather, privity or

knowledge is measured against the specific negligent acts or unseaworthy conditions that actually caused or contributed to the accident." Suzuki of Orange Park, Inc., 86 F.3d at 1064.

An owner's presence on board a vessel at the time of a collision does not automatically deny him the right to limitation if the cause of the collision "is one as to which the owner on board has no real knowledge or means of knowledge." Tittle, 544 F.2d at 756. "But where the operational command of the whole enterprise is in the hands of the owner then present, he is charged with privity and knowledge on usual principles for the negligent acts of those under his effective command." Id. The Limitation Act "does not limit liability for the personal acts of the owners done with knowledge," Pendleton v. Benner Line, 246 U.S. 353, 356 (1918), and a shipowner remains liable for his own fault and neglect. Am. Car & Foundry Co. v. Brassert, 289 U.S. 261, 264 (1933). Therefore, an owner is liable beyond the value of the ship and freight if he had privity or knowledge of the acts of negligence or conditions of unseaworthiness that caused the collision. Hercules Carriers, Inc., 768 F.2d at 1563.

## ADDITIONAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. Schneider's Privity and Knowledge Preclude Limitation of Liability

As the parties suggested in their Final Pretrial Stipulation (Doc. #103, p.3), the primary issue in this case is the determination of who is liable for the collision,

i.e., who is at fault.  A related issue, however, is whether Schneider is able to limit his liability pursuant to the Limitation Act.  The Court begins with the second prong of the typical analysis because the answer is clearcut and resolving it first clears the way to focus on the primary disputed issue.

Dr. Leonard's Third Affirmative Defense (Doc. #12, p. 3) and Allstate's Third Affirmative Defense (Doc. #21, p. 4) assert that all the acts of negligence or conditions of unseaworthiness were within Schneider's privity and knowledge, thereby precluding limitation of liability.  The Court finds Schneider has failed to establish the lack of either privity or knowledge, and indeed the evidence establishes the existence of both.  The facts summarized above establish beyond any doubt that Schneider was in operational command of the Schneider Vessel, was a participant in almost all the acts which are alleged to be negligent, was in privity with Slade as to all of Slade's conduct, and had knowledge of Slade's actions and all the activities which are alleged to be the bases for fault.  Schneider therefore cannot prevail on limitation, and any liability by Schneider is not limited to the post-accident value of the Schneider Vessel and its freight.

## B.  No Conditions of Unseaworthiness

Dr. Leonard's Answer (Doc. #12, ¶ 5) and other Answers deny the Complaint's allegation that the Schneider Vessel was seaworthy.  (Doc. #1, ¶ 5.)  Seaworthiness is based on the vessel owner's duty to ensure that the vessel is reasonably fit to be

at sea.  Lewis & Clark Marine, Inc., 531 U.S. at 441.  There was no evidence that the Schneider Vessel was not reasonably fit to be at sea, and the Court finds that at all relevant times the Schneider Vessel was fit to be at sea.

Seaworthiness, however, also requires a competent crew.  Hercules Carriers, Inc., 768 F.2d at 1563.  Neither the Schneider Vessel nor the Leonard Vessel required a crew of more than one person.  The Court finds that both Schneider and Slade were competent crew members capable of operating the Schneider Vessel in the Gulf of Mexico.  As discussed below, the Court rejects the testimony of Dr. Leonard and Captain Stoller as to various alleged deficiencies by Schneider and Slade as crew members.  The Court finds that there was no condition of unseaworthiness with the Schneider Vessel or its crew at the time of the collision.

### C.  Competing Claims of Negligence

Schneider and Dr. Leonard make competing claims that the other was negligent and that the negligence caused the collision.  In his Complaint, Schneider claims that Dr. Leonard was the sole cause of the collision because she "was negligent where she violated numerous COLREGS including, among others, that she failed to proceed at a safe and appropriate speed for the conditions, failed to maintain an adequate lookout, and did not take appropriate action to avoid the collision. Additionally, Julie C. Leonard's navigation lights were not operational at the time." (Doc. #1, ¶¶ 15-16.)   Dr. Leonard responded that the collision was caused by

Schneider, who violated COLREGS and is therefore presumed to be at fault under the <u>Pennsylvania</u> Rule.  (Doc. #12, p. 2.)

Additionally, Dr. Leonard filed a Second Amended Complaint which asserts negligence claims against both Schneider and Slade.  (Doc. #61.)  Dr. Leonard asserts that Schneider breached the duties owed in the operation of the Schneider Vessel "by failing to maintain proper lookout, failing to proceed at a safe speed so he could take proper and effective action to avoid a collision, failing to properly ascertain whether a [risk] of collision with 'Paradox' existed, and failure to take action to avoid collision with the 'Paradox.'  Alternatively[,] [Schneider] failed to supervise and or guide the actions of ROBEERT SLADE."  (Doc. #61, ¶ 18.)  The next paragraph asserts that Schneider breached his duty by: (a) "traveling at an excessive speed in reduced visibility caused by dense fog;" (b) "not posting a lookout as required by Rule 5 of the rules of the road;" (c) "failing to sound proper sound signals as required by the rules of the road;" (d) turning the Schneider Vessel "Port (right) [sic] contrary to the rules of the road;" (e) "failing to take early action to avoid collision, Rule 8 of the rules of the road;" and (f) failing to sound the danger signal, Rule 34, five short blasts of the whistle, upon observing the Claimant."  (Doc. #61, ¶¶ 19 (a)-(f).)

Allstate filed a Counterclaim against Schneider making the exact same allegations concerning the breaches of duty.  (Doc. #21, ¶¶ 22, 23.)

As to Slade, Dr. Leonard asserts that he also breached the duties owed in the operation of the Schneider Vessel "by failing to maintain proper lookout, failing to proceed at a safe speed so he could take proper and effective action to avoid a collision, failing to properly ascertain whether a [risk] of collision with 'Paradox' existed, and failure to take action to avoid collision with the 'Paradox.'" (Doc. #61, ¶ 24.)  The next paragraph asserted that Slade breached his duty by: (a) "traveling at an excessive speed in reduced visibility caused by dense fog;" (b) "not posting a lookout as required by Rule 5 of the rules of the road;" (c) "failing to sound proper sound signals as required by the rules of the road;" (d) turning the Schneider Vessel Port (right) [sic] contrary to the rules of the road;" (e) "failing to take early action to avoid collision, Rule 8 of the rules of the road;" and (f) failing to sound the danger signal, Rule 34, five short blasts of the whistle, upon observing the Claimant." (Doc. #61, ¶¶ 25 (a)-(f).)

### D.   Pertinent COLREGS "Rules of the Road"

All the parties cite to alleged violations of the COLREGS Rules of the Road to do double-duty: to shift the burden of proof as to causation pursuant to the Pennsylvania Rule, and to constitute, either singly or in combination, the actual negligence which caused the collision.  Four parts of the COLREGS (Joint Exhibit 86) contain rules which are relevant to this case.  Part A of the COLREGS sets forth general rules concerning the application of the COLREGS (Rule 1), the

responsibility of vessels, owners, masters, and crew (Rule 2), and the definitions of some of the terms (Rule 3).   Part B of the COLREGS sets forth sixteen rules regarding Steering and Sailing Rules (Rules 4 through 19.)   Rule 4 through Rule 10 apply in any conditions of visibility; Rule 11 through Rule 18 apply only to vessels in sight of one another; and Rule 19 applies to the conduct of vessels in restricted visibility.   Part C of the COLREGS addresses "Lights and Shapes," while Part D addresses "Sound and Light Signals."

The COLREGS begin by generally requiring good seamanship.   Rule 2 of COLREGS states in part:

> (a) Nothing in these Rules shall exonerate any vessel, or the owner, master, or crew thereof, from the consequences of any neglect to comply with these Rules or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.

COLREGS Rule 2(a).   Rule 2(a) has been interpreted to require "a vessel operator to take any precaution that may be required under the practice of good seamanship or special circumstances to avoid a collision."   Folino v. Porcelli, 8:10-CV-2028-T-17AEP, 2012 U.S. Dist. LEXIS 196363, 2012 WL 12897954, at *4 (M.D. Fla. June 29, 2012), aff'd, 516 F. App'x 845 (11th Cir. 2013).   The Court accepts Captain Stoller's testimony to the same effect.

The COLREGS also begin by setting forth an exception to the obligation to comply with any of the COLREGS rules.   COLREGS Rule 2(b) provides:

> (b) In construing and complying with these Rules due regard shall
>      be had to all dangers of navigation and collision and to any
>      special circumstances, including the limitations of the vessels
>      involved, which may make a departure from these Rules
>      necessary to avoid immediate danger.

COLREGS Rule 2(b).  "In other words, vessels may justify departure from the
COLREGS in order to avoid immediate danger, but not for more generic special
circumstances. . . . The plain text of the COLREGS allows only one avenue to steer
clear of their obligations: the "special circumstances" exception enshrined in Rule
2, which is limited to situations involving immediate danger."  <u>Crowley Marine
Servs. Inc. v. Maritrans Inc.</u>, 447 F.3d 719, 725 (9th Cir. 2006) (citations and
footnotes omitted.)  The Court therefore rejects Captain Stoller's testimony that the
COLREGS are always mandatory and allow for no exceptions.

The next set of pertinent COLREGS Rules address steering and sailing.
Under any condition of visibility (Rule 4) a vessel is required to maintain a proper
lookout.  COLREGS Rule 5 states: "Every vessel shall at all times maintain a proper
look-out by sight and hearing as well as by all available means appropriate in the
prevailing circumstances and conditions so as to make a full appraisal of the situation
and of the risk of collision."

Under any conditions of visibility (Rule 4) a vessel is required to travel at a
safe speed.  The relevant portion of COLREGS Rule 6 provides in pertinent part:

> Every vessel shall at all times proceed at a safe speed so that she can
> take proper and effective action to avoid collision and be stopped within

a distance appropriate to the prevailing circumstances and conditions. In determining a safe speed the following factors shall be among those taken into account:

(a) By all vessels:
    (i)  The state of visibility;
    (ii)  The traffic density including concentrations of fishing vessels or any other vessels;
    (iii)  The maneuverability of the vessel with special reference to stopping distance and turning ability in the prevailing conditions;
    (iv)  At night, the presence of background light such as from shore lights or from back scatter from her own lights;
    (v)  The state of wind, sea and current, and the proximity of navigational hazards;
    (vi)  The draft in relation to the available depth of water.

COLREGS Rule 6(a)(i)-(vi).

Under any condition of visibility (Rule 4), every vessel is also required to determine if a risk of collision exists. COLREGS Rule 7 provides in pertinent part:

(a) Every vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist.

    . . .

(c) Assumptions shall not be made on the basis of scanty information, especially scanty radar information.

COLREGS Rule 7(a), (c).

Under any condition of visibility (Rule 4), any vessel is also required to take action to avoid a collision. COLREGS Rule 8 provides in pertinent part:

28

(a) Any action taken to avoid collision shall be taken in accordance with Rules 4 through 19 and shall if the circumstances of the case admit, be positive, made in ample time and with due regard to the observance of good seamanship.

(b) Any alteration of course and/or speed to avoid collision shall, if the circumstances of the case admit, be large enough to be readily apparent to another vessel observing visually or by radar; a succession of small alterations of course and/or speed should be avoided.

(c) If there is sufficient sea room, alteration of course alone may be the most effective action to avoid a close-quarters situation provided that it is made in good time, is substantial and does not result in another close-quarters situation.

(d) Action taken to avoid collision with another vessel shall be such as to result in passing at a safe distance. The effectiveness of the action shall be carefully checked until the other vessel is finally past and clear.

(e) If necessary to avoid collision or allow more time to assess the situation, a vessel shall slacken her speed or take all way off by stopping or reversing her means of propulsion.

COLREGS Rule 8(a)-(e).

Certain navigation rules only apply when vessels are in sight of one another.

COLREGS Rule 11.  Vessels are deemed to be in sight of one another "only when one can be observed visually from the other."  COLREGS Rule 3(k).  When power-driven vessels are in sight of one another and on a head-on or nearly head-on course, each is required to alter course to starboard. COLREGS Rule 14(a).  COLREGS Rule 14 provides in relevant part:

(a) Unless otherwise agreed when two power-driven vessels are meeting on reciprocal or nearly reciprocal courses so as to involve risk of collision each shall alter her course to starboard so that each shall pass on the port side of the other.

. . .

(c) When a vessel is in any doubt as to whether such a situation exists she shall assume that it does exist and act accordingly.

COLREGS Rule 14(a), (c).

A special rule applies to vessels not in sight of one another when traveling in or near areas of restricted visibility.  COLREGS Rule 19(a).  "Restricted visibility" means "any condition in which visibility is restricted by fog, mist, falling snow, heavy rainstorms, sandstorms, or any other similar causes."  COLREGS Rule 3(l). The dense fog encountered by Dr. Leonard and Schneider in this case met the definition of "Restricted Visibility" set forth in COLREGS Rule 3(l).  In such circumstances, the following relevant provisions apply:

(b) Every vessel shall proceed at a safe speed adapted to the prevailing
circumstances and conditions of restricted visibility. A power-driven vessel shall have her engines ready for immediate maneuver.

(c) Every vessel shall have due regard to the prevailing circumstances and conditions of restricted visibility when complying with Rules 4 through 10.

. . .

(e) Except where it has been determined that a risk of collision does not exist, every vessel which hears apparently forward of

> her beam the fog signal of another vessel, or which cannot
> avoid a close-quarters situation with another vessel forward of
> her beam, shall reduce her speed to be the minimum at which
> she can be kept on her course. She shall if necessary take all
> her way off and in any event navigate with extreme caution
> until danger of collision is over.

COLREGS Rule 19(b)-(c), (e).

The COLREGS also provide for certain lighting, which is required in all weathers.  COLREGS Rule 20(a).  The lights are required to be activated at night and during the day in conditions of restricted visibility.  COLREGS Rule 20(b), (c). "The obligation to display proper lights is firmly established by both domestic and international regulation as part of the law of the sea."  Sunderland Marine Mut. Ins. Co., Ltd. v. Weeks Marine Const. Co., 338 F.3d 1276, 1278 (11th Cir. 2003)(citation omitted).  Failure to comply with proper lighting can be sufficient to trigger the Pennsylvania Rule presumption.  Id.  The details of the type and location of required lighting is not material to this case, since the only related claims are that the lighting was not activated.

Finally, there are also special sound signal rules when vessels are traveling in restricted visibility.   COLREGS Rule 35 provides in relevant part:

> In or near an area of restricted visibility, whether by day or night the
> signals prescribed in this Rule shall be used as follows:
>
> (a) A power-driven vessel making way through the water shall sound
>     at intervals of not more than 2 minutes one prolonged blast.

COLREGS Rule 35(a).

### E.  Resolution of Asserted COLREGS Violations and Negligence Claims

As discussed in greater detail below, the Court finds that the sole proximate cause of the collision was Dr. Leonard operating the Leonard Vessel at an excessive speed which was not safe for the conditions in which she was traveling. Because of this excessive speed, neither Schneider nor Slade were able to do anything to avoid the collision.

First, a word about Dr. Leonard's expert witness, Captain Stoller.  Captain Stoller is clearly qualified to state an opinion based on his many years of experience and prior testimony as an expert witness.  While the Court accepts some of these opinions, the Court finds many are unreliable, are based upon incorrect factual assumptions, or are simply wrong.  Captain Stoller has not been a captain of a seagoing vessel for over thirty years.  He stopped publishing over a decade ago, concentrating on being a consultant and expert witness.  He applied the wrong "Rules Of The Road" to his analysis of the case, insisting the Inland Navigation Rules applied because the collision was a mile from shore. Application of the Inland Navigation Rules depends on demarcation lines, not simply mileage from shore, even if this collision had been a mile from shore. Additionally, as discussed below, some of Captain Stoller's opinions are at odds with the clear language of the COLREGS or are not supported by credible facts, or both.

- **Good Seamanship in General**

Captain Stoller is correct that Rule 2(a) is essentially a good seamanship rule, and that Schneider is not exonerated from the COLREGS simply because he turned operation of the Schneider Vessel over to Slade.  Dr. Leonard asserts that a violation of Rule 2(a) results in a <u>Pennsylvania</u> Rule presumption.  The Court doubts that a violation of a good seamanship practice within the meaning of COLREGS Rule 2(a) necessarily triggers the <u>Pennsylvania</u> Rule presumption.  The general requirement of good seamanship is not necessarily a rule intended to prevent collisions such that the <u>Pennsylvania</u> Rule would always apply.  While a lack of good seamanship may certainly be considered in determining negligence, a violation of Rule 2(a) may, but does not necessarily, trigger a presumption of causation.  To hold otherwise would render the <u>Pennsylvania</u> presumption applicable to virtually every deficient act by a seaman, no matter how minor.  <u>See</u> <u>Sterling Equip., Inc. v. M/T Great E.</u>, 52 F. Supp. 3d 76, 83 (D. Mass. 2014) (recognizing that if the <u>Pennsylvania</u> Rule was triggered by Rule 2(a)'s "good seamanship" requirement, it would apply in almost every maritime case, and declining to invoke the <u>Pennsylvania</u> Rule due to violation of Rule 2.)

- **Use of Alcohol**

The use of alcohol is a good example of what may not be a good seamanship practice but does not trigger a presumption of causation.  Both federal and Florida

law prohibit boating under the influence (BUI). 46 U.S.C. § 2302(c); Florida Statutes § 327.35(1). Violation of either statute can trigger the presumption of fault under the <u>Pennsylvania</u> Rule. <u>Superior Const. Co.</u>, 445 F.3d at 1344-45. Neither the federal nor Florida statute, however, prohibit consumption of alcohol while boating unless it results in being under the influence as defined by the statutes.

Dr. Leonard suggested that both Schneider and Slade were impaired by alcohol because she could smell alcohol on both men when they boarded her vessel, Slade's speech was slurred, they had difficulty operating the vessels after the collision, they had failed to set up navigation lights, they seemed not to know where they were in the water, and their appearance suggested alcohol use. The Court has found that "[t]here is no reliable evidence that either Slade or Schneider consumed any other alcohol that day or were under the influence of alcohol at the time of the collision." *Supra* p. 7. The Court has also found that Schneider did not fail to activate his navigation lights. *Supra* p. 9. The Court finds that there is no reliable evidence that either Schneider or Slade was operating the vessel under the influence of alcohol, or that their operation of the Schneider Vessel was impaired by the use of alcohol. The alcohol intake was relatively minimal and was two and a half hours prior to the collision. The Court does not find Dr. Leonard's observations after the collision to be reliable given the injuries she suffered, the vagueness of her stated reasons, and the contrary factual findings made by the Court. Even if Dr. Leonard's

observations are accurate, they do not convince the Court that the prior consumption of the beer had anything to do with the subsequent collision.  The Court finds that the consumption of alcohol in this case had no causal connection to the collision that occurred over two hours later.

- **Familiarity With The "Rules of Road"**

Schneider admits that he was not familiar with the "Rules Of The Road," and he did not ascertain whether Slade was familiar with them prior to the time he turned over operation of his vessel to Slade.  This is clearly a violation of good seamanship, but does not trigger the <u>Pennsylvania</u> Rule, or constitute an act of neglect under the facts of this case.  This omission had nothing to do with the cause of the collision in this case.  At the time of the collision Slade was operating the Schneider Vessel, and the testimony is uncontradicted that he <u>was</u> familiar with the "Rules Of The Road." As discussed below, Slade neither did something, nor failed to do something, which contributed to the cause of the collision.

- **Adequate Lookout**

As discussed earlier, under any condition of visibility a vessel is required to maintain a proper lookout.  COLREGS Rule 5.    Both Dr. Leonard and Schneider claim the other failed to maintain a proper lookout.  Captain Stoller testified that both Schneider and Slade failed to maintain a proper lookout, but articulated no convincing reason.  The Court rejects the opinion of Captain Stoller and the

arguments of both Dr. Leonard and Schneider. The Court finds that both Dr. Leonard and Schneider maintained a proper (although unsuccessful) lookout leading up to the collision.

- **Absence of Lights**

The COLREGS require power driven vessels to maintain certain lights during the nighttime and, in restricted visibility conditions, during the day. COLREGS Rule 20. The Court has found that Dr. Leonard activated her lights when she paused for about a minute to put on a lifejacket. *Supra* p. 8. The Court has also found that Schneider activated his navigation lights after turning operation of the Schneider Vessel over to Slade. *Supra* p. 9. Dr. Leonard and Schneider have both testified that they each saw that the other's lights were not operational at the time of the collision. The Court does not find either of their testimony credible on this point, and continues to find that both the Leonard Vessel and the Schneider Vessel had their respective navigation lights activated at the time of the collision. The evidence the Court finds convincing establishes no violation of Rule 20 or a negligent act regarding lights.

- **Safe Speed**

The COLREGS require that under any condition of visibility a vessel must proceed at a safe speed. COLREGS Rule 6. The rule essentially defines safe speed as a speed at which a vessel "can take proper and effective action to avoid collision

and be stopped within a distance appropriate to the prevailing circumstances and conditions." Id.  The rule does not pre-determine what speed is safe, but sets forth a number of factors to be considered, including visibility.  COLREGS Rule 6(a).  A special rule applies to vessels not in sight of one another when traveling in or near areas of dense fog, such as existed in this case.  COLREGS Rule 19(a).  In such circumstances, "[e]very vessel shall proceed at a safe speed adapted to the prevailing circumstances and conditions of restricted visibility. A power-driven vessel shall have her engines ready for immediate maneuver."  COLREGS Rule 19(b).

As the Court has already found, the Schneider Vessel was traveling approximately 10 miles an hour in the dense fog. *Supra* p. 9.  The GPS establishes that the Leonard Vessel's speed was 29 mph in the dense fog at the time of the collision. *Supra* p. 10 .  Dr. Leonard and Captain Stoller assert that the Schneider Vessel was proceeding at an excessive rate of speed, while the Leonard Vessel was proceeding at a slow, safe, appropriate speed.  The Court rejects the opinions of Dr. Leonard and Captain Stoller as to speed.  The Court finds that the ten miles per hour by the Schneider Vessel was a reasonable speed under the circumstances, but that the 29 miles per hour by the Leonard Vessel was grossly excessive under the circumstances.  The Leonard Vessel was neither traveling at a "slow" speed nor a safe and appropriate speed.  But for Dr. Leonard's speed, the collision would not have occurred.  Dr. Leonard's speed was a violation of Rule 6 and Rule 19 because

her vessel was not operating at a safe speed when taking into account the state of visibility of only 75 to 100 feet.  Dr. Leonard has not rebutted the <u>Pennsylvania</u> Rule presumption.  Even without the presumption, the Court finds that the cause of the accident was the excessive speed of Dr. Leonard's vessel.

- **Awareness and Avoidance of Possible Collision**

Under any condition of visibility, every vessel is required to "use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists."   COLREGS Rule 7(a).  When in doubt, "such risk shall be deemed to exist." <u>Id.</u>  Additionally, under any condition of visibility, any vessel is required to take action to avoid a collision.  COLREGS Rule 8.

Here, Dr. Leonard failed to use all available and appropriate means to determine if a risk of collision existed.  Dr. Leonard's vessel was traveling at an excessive speed in dense fog, and the required action under both COLREGS Rules 7(a) and 8 was to slow down to a reasonable speed, such as that of the Schneider Vessel.  Given her excessive speed, there was no time for Schneider or Slade, or Dr. Leonard for that matter, to take meaningful steps to avoid the collision.

As discussed earlier, the Court finds that Slade attempted to turn the Schneider vessel to port, but was unable to do anything other than shift the balance of the vessel on the water.  *Supra* p. 10.  The Court accepts the testimony of Mr. Taylor that the Schneider Vessel did not begin to make the turn, that the attempted maneuver had

nothing to do with the collision, and that the collision would have been avoided if Dr. Leonard had not turned hard right upon seeing the Schneider vessel.  The Court also finds that Schneider did not fail to supervise or guide the actions of Slade.

- **Proper Sound Signals Use of Sound Signals (Horn)**

The evidence is undisputed that neither vessel sounded a prolonged blast of a horn every two minutes, as required by COLREGS Rule 35(a).  Additionally, it is undisputed that neither vessel sounded the five short, rapid blasts pursuant to COLREGS Rule 34(d), although that only applies when vessels are in sight of one another.   The Court finds that Schneider's failure to sound his horn every two minutes did not impact the collision since, according to Mr. Taylor, Dr. Leonard could not have heard it given the speed her vessel was traveling.

## CONCLUSION

In sum, the Court finds:

1. As to the Complaint for Exoneration From or Limitation of Liability (Doc. #1), James Schneider is not entitled to limitation of liability because he had knowledge and privity, but is entitled to exoneration because 100% of the fault for the collision was due to the negligence of Dr. Julie Leonard.  The Claim filed by Dr. Julie Leonard (Doc. #12) and the Claim filed by Allstate Property and Casualty Insurance Company (Doc. #21) are denied, and neither shall take anything on their respective Claim.

2.  As to the Second Amended Complaint (Doc. #61), the negligence claims are resolved in favor of James Schneider and Robert Slade, and Dr. Julie Leonard shall take nothing.

3.  As to the Counterclaim by Allstate (Doc. #21), the counterclaim for negligence against James Schneider is resolved in favor of Mr. Schneider, and Allstate Property and Casualty Insurance Company shall take nothing.

4.  The Clerk shall enter judgment accordingly.

**DONE AND ORDERED** at Fort Myers, Florida, this __14th__ day of March, 2023.


_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE


Copies:
Counsel of record